JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff    Duvall County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Delaware County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Wiggin and Dana LLP, Two Liberty Place, 50 S. 16th Street, Suite 2925, Philadelphia, PA 19102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☒ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)

Brief description of cause: Franchisor, at behest of its parent company, is systematically breaching franchise agreement.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ More than $10,000,000 and injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
May 30, 2024

SIGNATURE OF ATTORNEY OF RECORD
*Christopher Bates*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

05/2023

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _(see attached as multiple Plaintiffs)_____

Address of Defendant: _(see attached as multiple Defendants)_____

Place of Accident, Incident or Transaction: __Glen Mills, PA_____

---

**RELATED CASE IF ANY:**

Case Number:_____ Judge:_____ Date Terminated_____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐ No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit Pending or within one year previously terminated action in this court?  Yes ☐ No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier Numbered case pending or within one year previously terminated action of this court?  Yes ☐ No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se case filed by the same individual?  Yes ☐ No ☐

I certify that, to my knowledge, the within case ☐ **is** / ☒ **is not** related to any now pending or within one year previously terminated action in this court except as note above.

DATE: May 30, 2024    _____    ___321802___

  *Attorney-at-Law* *(Must sign above)*    *Attorney I.D. # (if applicable)*

---

**Civil (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify)*:_____
☐ 7. Products Liability
☒ 8. All Other Diversity Cases: *(Please specify)* Franchise Contract and Business Torts

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, _Christopher Bailes_____, counsel of record *or* pro se plaintiff, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☒ Relief other than monetary damages is sought.

DATE: _May 30, 2024_____    _____    ___321802___

  *Attorney-at-Law* *(Sign here if applicable)*    *Attorney ID # (if applicable)*

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.

**Designation Form**

**(Attachment)**

**Addresses of Plaintiffs:**

1.      American Cargo Logistics, Inc., 400 Eastport Road, Jacksonville, FL 32218

2.      Cavalier Cargo Group, Inc., 510 Eastpark Court, Suite 180, Sandston, VA 23150

3.      1st Coast Cargo, Inc.,1400 Eastport Road, Jacksonville, FL 32218

**Addresses of Defendants:**

1.      Pilot Air Freight, LLC, 2 Braxton Way, Glen Mills, PA 19342

2.      Maersk Logistics & Services USA, Inc., 180 Park Avenue, Florham, NJ 07932

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSLYVANIA**

| | | |
|---|---|---|
| AMERICAN CARGO LOGISTICS, INC., | : | |
| CAVALIER CARGO GROUP, INC., | : | |
| 1ˢᵗ COAST CARGO, INC. | : | |
| | : | |
| | : | CASE NO: |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PILOT AIR FREIGHT, LLC, MAERSK | : | |
| LOGISTICS & SERVICES USA, INC., | : | |
| | : | |
| Defendants. | : | May 30, 2024 |

## COMPLAINT

### NATURE OF THE ACTION

1.      This is an action to hold Pilot Air Freight, LLC ("Pilot") and Maersk Logistics & Services USA, Inc. ("Maersk") accountable for their coordinated and systematic plot to deprive Plaintiffs American Cargo Logistics, Inc. and Cavalier Cargo Group, Inc. (collectively "Franchisees") of their respective rights and benefits under the long-standing franchise agreements with Pilot.

2.      For almost twenty years, Franchisees and Pilot mutually enjoyed the benefits of the franchise relationship between them, with Franchisees generating tens of millions of dollars each year in revenue for Pilot and Franchisees enjoying a healthy return on their millions of dollars of investment into their Pilot stations. This remained true even after Pilot was initially sold to private equity in 2016, which rolled up most of the Pilot franchise System and operated the purchased locations as "company stations."

3.      Ultimately, Pilot's prior ownership decided to sell itself in 2022 to the global shipping conglomerate A.P. Møller Maersk A/S for $1.7 billion. The transaction closed on May 2,

1

2022.  By purchasing the Pilot entity, Maersk gained complete control over Pilot's performance of its franchise agreements and the policies and procedures used within the Pilot System. Maersk and Pilot originally said all the right things about wanting to preserve the Pilot brand, to grow its business, and to have Pilot honor the franchise agreements with Franchisees, which they referred to as "partners." The reality is that Maersk had no intention of preserving Pilot or having Pilot honor its franchise agreements with Franchisees.

4.      Instead, beginning in early 2023, Maersk began systematically dismantling the Pilot brand and Pilot System. It ordered Pilot to cease use of the Pilot marks, rebranded the Pilot website as "Maersk," and told customers that Pilot is now "Maersk." In undertaking this transition, Pilot and Maersk, however, have gone to great pains to explain that this is just a change of "branding." They have since discontinued all marketing or advertising of the Pilot brand. However, Pilot and Maersk have not allowed Franchisees to utilize these new Maersk marks, and instead have relegated them and two other franchise locations to using the now functionally defunct Pilot name and brand. They have prevented Franchisees from using the Maersk marks because then they will have to honor the territorial exclusivity provisions in Franchisees' franchise agreements and provide compensation to Franchisees consistent with the Franchise Agreements, which is inconsistent with Maersk's practice and protocol of not sharing revenue with the other Pilot stations it owns and controls.

5.      Pilot, at Maersk's direction, has also undertaken a variety of conduct meant to slowly weaken and isolate the Franchisees from the rest of the Pilot System of stations that are now branded as Maersk. Among other things, Pilot:

    a.   no longer provides any meaningful marketing or training,

    b.   no longer offers help quoting new business,

    c.   manipulates quoted freight rates after the fact,

    d.   injects Maersk affiliates into shipment streams unnecessarily to increase profits to Maersk and decrease them to Pilot,

    e.   takes on money losing work for the Pilot system so Maersk can make a "fat profit,"

    f.   refuses to rebid existing Pilot work through the Pilot System, and

    g.   routes shipments in Franchisees' exclusive territories through other Maersk subsidiaries.

6.    In short, Pilot and Maersk have engaged in a systematic, unlawful scheme to move the economic benefits and value inherent in the Pilot franchise System to itself. The reason Maersk has directed Pilot to engage in this conduct is obvious: Maersk does not like having to share the wealth with Franchisees. On work conducted through a Pilot franchisee, Pilot has to split the revenue from the shipment with the Franchisees. If Maersk and Pilot can avoid Franchisees, they pocket everything.

7.    The problem with Maersk's approach is that it must take Pilot as it found it; just like Maersk cannot order Pilot to breach contracts with customers or vendors because it does not benefit Maersk's bottom line, it cannot order Pilot to degrade and destroy Franchisees' contractual rights to a functioning Pilot brand and System just so that Maersk can line its own pockets.

**THE PARTIES**

8.    Plaintiff American Cargo Logistics, Inc. ("ACL") is a Florida corporation with its principal place of business at 1400 Eastport Road, Jacksonville, Florida 32218. ACL is a citizen of Florida for purposes of diversity jurisdiction.  ACL operates a Pilot Air franchise, often referred

to as a station, with an exclusive service area that is set forth in its franchise agreement and includes Southern Georgia and Northern Florida, as well as the Jacksonville, Florida metro area.

9.      Plaintiff Cavalier Cargo Group, Inc. ("CCG") is a Virginia corporation with its principal place of business at 510 Eastpark Court, Suite 180, Sandston, VA 23150. CCG is a citizen of Virginia for purposes of diversity jurisdiction.  CCG operates two Pilot Air stations that collectively have an exclusive service area, as set forth in their franchise agreements, in Northern North Carolina, and a large portion of the state of Virginia, including the Richmond and Norfolk, Virginia metro areas. CCG also provides cartage services at the Richmond station. CCG and ACL are collectively referred to in this Complaint as "Franchisees."

10.      Plaintiff 1st Coast Cargo, Inc. ("1st Coast") is a Florida corporation with its principal place of business at 1400 Eastport Road, Jacksonville, Florida 32218. 1st Coast is a citizen of Florida for purposes of diversity jurisdiction. 1st Coast provides warehouse storage and cartage services to area businesses, freight forwarders, and other transportation companies in the Northern Florida and Southern Georgia service areas, including to ACL's Jacksonville station. 1st Coast also provides cartage services to certain customers at CCG's Norfolk station.

11.      Pilot Air Freight, LLC, formerly known as Pilot Air Freight Corp. ("Pilot"), is a Delaware limited liability company that has its headquarters in Glen Mills, Pennsylvania. In 2022, Maersk Logistics & Services USA, Inc. acquired Pilot. Maersk Logistics & Services USA, Inc. is the sole member of Pilot.

12.      Maersk Logistics & Services USA, Inc. ("Maersk") is a Delaware corporation with its principal place of business at 180 Park Avenue, Florham, New Jersey. Maersk is a wholly owned subsidiary of the global conglomerate A.P. Møller Maersk A/S. Maersk, and thus Pilot, is a citizen of Delaware and New Jersey for purposes of diversity jurisdiction.

4

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are citizens of Florida and Virginia while Defendants are citizens of Delaware and New Jersey and the amount in controversy exceeds $75,000.  It also has jurisdiction pursuant to 28 U.S.C. § 2201 because Plaintiffs are seeking a declaratory judgment resolving certain rights that are in dispute among the parties.

14.     This Court has general personal jurisdiction over Pilot because it has its principal place of business in Pennsylvania and is therefore at home in Pennsylvania. This Court additionally has personal jurisdiction over Pilot because it has consented to this Court's jurisdiction in multiple contracts with Franchisees. *See* Franchise Agreements at § 26.2; 2021 Franchise Agreement Extensions at § 9.  Finally, Pilot is registered to do business in Pennsylvania. The Supreme Court has held that such registration results in a consent to jurisdiction. *See Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122 (2023).

15.     The Pennsylvania long-arm statute extends the personal jurisdiction of Pennsylvania courts over non-residents to the furthest extent allowed under the United States Constitution. *See* 42 Pa. Con. Stat. § 5322(b). The minimum contacts necessary to satisfy the due process requirements of the U.S. Constitution are satisfied in this matter and the Court has specific personal jurisdiction over Maersk. Among other things, Maersk is the parent company of Pilot and exercises significant control and oversight over Pilot's operations in Pennsylvania, including regularly reaching into Pennsylvania to exercise that control and oversight. Maersk also generates tens of millions of dollars in revenue each year from its ownership of and control over Pilot. In addition, Maersk: (a) directed Pilot to breach its contracts with Plaintiffs and engage in conduct that violated the Virginia Retail Franchising Act, (b) tortiously interfered with Plaintiffs' various

contracts, and (c) engaged in conduct that violated the Florida Deceptive and Unfair Trade Practices Act. Maersk was undoubtedly aware that these actions had some connection to Pennsylvania because Pilot is headquartered in the commonwealth and Maersk was directing Pilot and/or its employees at Pilot headquarters to take these actions. By engaging in such conduct and knowing that Pilot would execute Maersk's plan from Pilot's headquarters in Pennsylvania, Maersk is subject to personal jurisdiction in Pennsylvania.

16.     Plaintiffs have filed this lawsuit in Pennsylvania due to the mandatory forum selection clause in Franchisees' contracts with Pilot, *see* Franchise Agreements at § 26.2; 2021 Extensions at § 9, as instructed by the Supreme Court's decision in *Atlantic Marine Construction Co., Inc. v. United States District Court*, 571 U.S. 49 (2013).  Venue is thus proper in this District pursuant to *Atlantic Marine*. *See id.* Venue is also proper in this District under 28 U.S.C. § 1391(b)(1), as all defendants are residents of this District for purposes of deciding venue, and 28 U.S.C. § 1391(b)(2), as this District is one where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

### A.     The Pilot Network

17.     Pilot is a full-service transportation and logistics provider that grew over the last fifty years from one station in Philadelphia to an international logistics company with dozens of stations throughout North America, along with several stations in Western Europe. Pilot's primary business is freight forwarding, which involves acting as an intermediary to help customers arrange for the movement of goods to their final destinations.  Freight forwarders such as Pilot will arrange the movement of the freight by various means, including rail, air, land, and sea, to get to its destination and provide customers with the pricing for moving that freight. Pilot also provides full

mile and final mile delivery services, time-definite delivery services, product warehousing, and inventory management solutions.

18.     Over time, the Pilot brand had become widely recognized as a trusted freight forwarding business with a nationwide network and international capabilities. Pilot owns and previously used multiple registered trademarks and word marks to promote and support the Pilot brand and Pilot network of stations, including the well-known Pilot logo:



19.     For many years, Pilot was organized as a franchisor and operated largely through a franchise model, with Pilot offering entrepreneurs the opportunity to become franchisees and run stations as franchised businesses throughout the country. The franchise model allowed Pilot to expand and grow to the size it is today.

20.     Matt Loux is the sole shareholder of each Plaintiff. ACL opened Mr. Loux's first Pilot franchise in 1997 with only a handful of employees. Due to his success in the Jacksonville market, CCG became the franchisee in Richmond in 2001 and in Norfolk in 2003. Further, 1st Coast, which is also owned by Mr. Loux, is a cartage company that transports freight to and from some of the Pilot franchise stations to their destinations and/or to other forms of transportation as they move along their journey. The Pilot business model requires that each station have at least one cartage agent, and Pilot encouraged franchisees to own the cartage agent even though it is not mandatory for the franchisee to be the cartage agent. 1st Coast is a cartage agent for some of Franchisees' stations.

21.     Mr. Loux and his employees worked hard to promote the Pilot brand, offer top notch customer service, and grow the Pilot business in their territories. Mr. Loux and his companies

have been extremely successful in the operation of the Pilot stations and the ancillary cartage companies. They have won countless operational awards and the Jacksonville station has consistently been in the Top 10 producing stations for over a decade. In 2021, Mr. Loux's three stations generated almost $50 million in revenue a year in Pilot freight forwarder revenue.

**B. The Franchise Agreements with Pilot**

22.     Pilot and Franchisees have entered into three identical franchise agreements to govern their relationship, one for each of Franchisees' stations. The franchise agreements were each signed on or about March 28, 2011 (the "Franchise Agreements") and were extended for additional ten-year terms in 2021 (the "Extensions"). A copy of the ACL Franchise Agreement is attached hereto as Exhibit 1 and a copy of the ACL Extension is attached hereto as Exhibit 2.[1]

23.     The first page of the Franchise Agreements contains recitals setting forth the basic bargain and fundamental reason why the parties are entering into the franchisor-franchisee relationship. These recitals state:

> WHEREAS, [Pilot], as the result of the expenditure of time, skill, effort, and money, has developed a distinctive and proprietary system relating to the establishment and operation of a logistics operations business, offering customers services relating to cargo storage, warehousing, and inventorying; transportation related services; and freight transportation services; and which arranges for the transportation of domestic and international cargo utilizing the services of multi-modal common carriers, including airlines, trucking companies and ocean steamship lines (the "System").

> WHEREAS, the distinguishing characteristics of the System include, without limitation, uniform standards and specifications for services and operations; quality and uniformity of services and products offered; training and assistance; copyrighted materials; confidential, proprietary information; certain Proprietary Marks (as hereinafter defined); and advertising, marketing and promotional programs and sales manuals; all of which may be changed, improved, and further developed by Franchisor from time to time;

---

[1] Because the CCG Franchise Agreements and Extensions for the two other stations are believed to be identical in all material respects to the ACL Franchise Agreement and ACL Extension, Plaintiffs have not attached a copy of the CCF Franchise Agreements and Extensions to the Complaint.

WHEREAS, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited to, the marks "Pilot," "Pilot Air Freight," "Pilot Marine Services," "Pilot Logistics Services," "Pilot Freight Services," as are now designated and may hereafter be designated from time to time by Franchisor in writing for use in connection with the System (the "Proprietary Marks");

WHEREAS, Franchisor is engaged in the business of offering franchises to qualified persons to operate a freight transportation business using the System and the Proprietary Marks (the "Franchised Business") in designated, geographic areas and has established a reputation of, demand for, and goodwill in the System;

WHEREAS, Franchisee desires to obtain the right to operate a Franchised Business in the geographic area as hereinafter set forth, and wishes to enter into an agreement with Franchisor for that purpose, and to receive the training and other assistance provided by Franchisor in connection therewith; and

WHEREAS, Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, appearance, and service and the necessity of operating the Franchised Business in conformity with Franchisor's standards and specifications.

Franchise Agreement at First Recital.

In short, the recitals lay out the basic bargain as: (1) Pilot is engaged in the business of franchising and has a valuable and proprietary system for operating a freight forwarding business and a recognized and valuable Pilot brand that it licenses as part of the System; and (2) Franchisees want to use and are licensed to use that System and Pilot branding.

24.     The Franchise Agreements elsewhere recognize the importance of the System and the Franchised Business's goodwill and reputation, by stating that "every detail of the Franchised Business is important to Franchisee, Franchisor, and other franchisees" because such details are necessary "in order to develop and maintain high, uniform operating standards throughout the System, to increase the demand for the services and products sold by all franchised businesses operating under the System, and to protect Franchisor's reputation and goodwill in the System and the Proprietary Marks." Franchise Agreements at § 7.1.

25.     The Franchise Agreements further confirm that the Proprietary Marks "serve to the identify the System and those who are authorized to operate under the System." *Id.* at § 8.3.2.

26.     Section 1.1 of the Franchise Agreements identifies the central benefit to Franchisees of the franchise relationship, as it grants Franchisees the right to "to establish and operate a Franchised Business," and "to use the Proprietary Marks and the System."

27.     The Franchise Agreements not only grant Franchisees a right to establish a Franchised Business and use the Proprietary Marks and the System, but also protect Franchisees from various forms of competition by Pilot and others associated with it. Section 1.3 of the Franchise Agreements explains that Franchisees will have an exclusive operating territory during the term of the Franchise Agreements and places numerous limitations on how Pilot and its affiliates may compete with Franchisees. Section 1.3 (emphasis added) states, in relevant part:

> Except as otherwise provided in this Agreement, **during the term of this Agreement, Franchisor shall not establish or operate, or license any other person to establish or operate, a freight transportation and logistics business using the Proprietary Marks and the System at any location within the area described in Exhibit C (the "Territory").** Franchisor retains the rights, among others, on any terms and conditions Franchisor deems advisable, and without granting Franchisee any rights therein, unless otherwise provided herein: (a) to establish and operate, and license others to establish and operate, a freight transportation or logistics business at any location outside the Territory; (b) **Subject to Franchisee's right of first refusal, to sell or provide, directly or indirectly, or license others to sell or provide, any services or products, other than those services or products provided under the System, under the Proprietary Marks or any other marks, at any location (notwithstanding proximity to the Approved Location) whether within or outside the Territory;** (c) **to acquire and operate any business or store of any kind not operating under the Proprietary Marks, other than a business or store that that offers products or services that are the same or similar to the products or service offered by the Franchised Business,** at any location (notwithstanding its proximity to the Approved Location) whether located within or outside the Territory; (d) to sell or distribute, directly or indirectly, or license others to sell or distribute, via any other channels of distribution, at any location, whether within or outside the Protected Territory, any services or products, under the Proprietary Marks or any other marks, notwithstanding Section 1.3(b); and (e) to market or sell any services to national accounts outside the Territory, or, after notice to Franchisee, within the Territory if

such account is not an existing local account of the Franchisee at such time. The right of first refusal referenced in paragraph 1.3(b) shall require Franchisor, prior to engaging in the activities stated therein, to first offer Franchisee the option to engage in such activities in the Territory on such terms and conditions that Franchisor determines are due or, has offered, or will offer, in writing, to charge any other person for the same opportunity. Franchisee shall have ninety (90) days to accept such offer in writing then it will expire. Franchisor may engage in such activities prior to the commencement of such activities by the Franchisee pursuant to the terms of the offer.

28.     The Franchise Agreements also obligate Pilot to carry out certain enumerated actions for the benefit of the Franchisees, including to:

- "provide training as set forth in Section 6 of this Agreement." Franchise Agreements at § 3.2.
- "make available to Franchisee advertising and promotional materials as provided in Section 12.4 hereof." *Id.* at § 3.5.
- provide a copy of Pilot's "confidential operating manual (the 'Manual'), as more fully described in Section 9 hereof." *Id.* at § 3.6.
- "provide to Franchisee from time to time, as Franchisor deems appropriate, advice and written materials concerning techniques of managing and operating the Franchised Business, including, but not limited to, required and suggested products, services, or suppliers and sales methods, new developments and improvements in Franchised Business operating techniques, and new developments in services and marketing techniques." *Id.* at § 3.7.
- "market and promote the System, in the Territory and otherwise. . . ." *Id.* at § 3.13.
- "provide Franchisee with such reports of customer invoicing, customer collections, purchased transportation and chargebacks as are reasonably required under the system. Franchisor shall provide Franchisee with reasonable back-up documentation for such transactions as Franchisee may request." *Id.* at § 3.14.

29.     The Franchise Agreements "recogniz[e] the value of advertising and promotion" to the System and having standardized "advertising and promotion programs to the furtherance of the goodwill and public image of the System." *Id.* at § 12.

30.     To achieve the parties' shared goals for advertising and promotion of the brand, the Franchise Agreements require Franchisees to pay a percentage of the Gross Billings (*i.e.* the amount paid by the customer to Pilot) to "the System's marketing, brand development and business development fund (the 'Fund')." *Id.* at § 12.1. The Fund is specifically identified as being

11

"intended to maximize general public recognition, acceptance, and use of the System." *Id.* at § 12.2.1.

31.    The Franchise Agreements grant Pilot the right to administer the Fund and direct "all marketing, advertising, brand development, public relations, sales, and promotional programs," but make clear that all contributions to the Fund must be used "exclusively to meet any and all costs of maintaining, administering, directing, conducting, and preparing advertising, marketing, public relations, sales and/or promotional programs and materials, and any other activities which Franchisor believes will enhance the image of the System." *Id.* at § 12.2.2. The Franchise Agreements provide a laundry list of promotional and marketing activities for which the Fund can be used. *Id.*

32.    The Franchise Agreements state that the Fund is not "to inure to the benefit" of Pilot, "shall be accounted for separately from the other monies of [Pilot]," and there will be "separate bookkeeping accounts for the Fund." *Id.* at § 12.2.3; *see also id.* at § 12.2.6 ("The Fund is not and shall not be an asset of [Pilot]."). Pilot also is prohibited from using the Fund "to defray any of [Pilot's] expenses," except for such costs and overhead that directly relate to the Fund's implementation of its "marketing, brand, and business development programs for franchisees and the System." *Id.*

33.    Pilot must, upon request, provide Franchisees with "an annual accounting by general ledger account title of receipts and disbursements of the Fund." *Id.* at § 12.2.4.

34.     Pilot further promised that, so long as it is at Franchisees' expense, it will make available to Franchisees "advertising plans and promotional materials, including merchandising materials, sales aids, special promotions, direct mail materials, and similar advertising and promotional materials." *Id.* at § 12.4.

35.     Underscoring the importance of the System, goodwill, and brand to the Franchise Agreements, Franchisees promised in the Franchise Agreements that they will operate their franchises in "strict conformity with such methods, standards, and specifications as Franchisor may from time to time reasonably prescribe in the Manual or otherwise in writing." *Id.* at § 7.2(d).

36.     The Franchise Agreements spell out a number of actions that the Franchisees must take to ensure that they are operating "in strict conformity with these methods." These specifically identified actions include that Franchisees must maintain the station's physical location; use certain software and hardware required by Pilot; allow for inspections of their stations; maintain a sufficient supply of "fixtures, furnishings, equipment, signs, products, materials, and supplies as conform with Franchisor's reasonable standards and specifications;" sell only products or services that Pilot has approved; and "ensure that all advertising and promotional materials, signs, decorations, and other items specified by Franchisor bear the Proprietary Marks in the form, color, location, and manner prescribed by [Pilot.]" *Id.* at §§ 7.3-7.11.

37.      The Franchise Agreements require that the Franchisees only use the Proprietary Marks to operate the Franchised Business, but specifically recognize that Pilot may "modify the Proprietary Marks or substitute different proprietary marks for use in identifying the System and the businesses operating thereunder at Franchisor's sole discretion." If Pilot substitutes new marks, it must "bear the cost of modifying" Franchisees' signage and advertising materials." *Id.* at § 8.37.

38.     Similarly, Pilot retains a limited right to change how the System operates, which is supposed to be done by modifying the Manual and giving Franchisees notice of the changes. However, Pilot cannot make changes to Manual (and thus the System) that "modify the material terms of this Agreement or the material terms of the Manual." *Id.* at § 9.

39.     The Franchise Agreements, like virtually all other franchise agreements used by franchisors in all industries, require Franchisees to pay royalties to Pilot as consideration for the benefit of having access to the System and use of the Proprietary Marks. The amount of royalty owed varies based on the type of shipment at issue. For example, Domestic Cargo Services require payment of a 13% royalty on the shipment's Gross Billings. Conversely, Pilot receives a royalty of 30% of the Gross Profits for Profit Pool Cargo Services and International Cargo Services. *Id.* at § 4.3.

40.     The Franchise Agreements allow Pilot, with the written agreement of the Franchisees, to allocate how profits are shared among stations for special or profit split shipments. The profit split percentages among the stations vary depending on the size of shipments, volume of shipments, location of customers, the number of stations that must handle the shipments, and whether Pilot or a particular station was responsible for the sale.

41.     For example, National Accounts are a type of "Profit Pool" account. These accounts, which require more than $20,000 in revenue per month and three or more shipping locations, are managed by a national account manager. For these accounts, Pilot's royalty is 30% of the Gross Profits. The Franchise Agreements state that Gross Profit is calculated by subtracting from the Gross Billings the actual cost of purchased transportation for the account and any other direct costs to Pilot in connection with such cargo. This remaining profit is "pooled together" and split amongst all of the Pilot stations involved in the account based on the amount of the revenue generated by each individual station's handling of the account. For example, if the Jacksonville station was responsible for 20% of the revenue associated with a particular account, then ACL would receive 20% of the Gross Profits that remain after Pilot takes its 30% Royalty.

14

42.     Similarly, I.L.S. (Inbound Logistic Service) shipments are ones where the corporate headquarters or controlling entity of the account is located in the station's service area (*i.e.*, the control station), but the shipments themselves originate in another station's sales territory (*i.e.*, the origin station). An example of this situation would be where a customer headquartered in Arkansas seeks to ship product originating in Florida. In these instances, Pilot receives a 13% royalty on Gross Billings and then, the controlling station receives 60% of the remaining Gross Profits while the origin station gets 40% of the remaining Gross Profits. For Special Split ILS, Pilot may require or the station may choose, if certain weight goals are met, to follow a formula where Pilot receives 30% of the Gross Profit, with the controlling station receiving 60% of the remaining profit and the origin station receiving the other 40%.

43.     This splitting of profits among stations is done regardless of whether a station is a franchise or if it is owned by Pilot. It ensures that stations have a financial incentive to service all customers of Pilot and their fellow stations. It also ensures that if one station handles a segment of transportation that, on its own, would be profit losing, the station is not subsidizing other stations on overall profitable transactions.

## C. The Pilot System Requires the Franchisee to Have a Relationship with a Cartage Agent

44.     Cartage is the transportation of shipments by road from a warehouse, airport, port, or rail depot to another point on its journey. Cartage can be transporting a shipment from one delivery point to another collection point, or it can be taking the shipment to its final delivery point at a customer's facilities. An example of cartage would be going to the airport to pick up shipments that have arrived that day and then transporting them by van or delivery truck to a ground freight facility or to an overnight delivery service's distribution center. Another example of cartage would

be taking goods delivered by freight line or rail to a Pilot station for warehousing or loading onto a delivery truck for direct delivery to a customer.

45.     The Manual in Section 8 requires that franchisees identify and appoint a "primary cartage agent," which is responsible for the conduct of cartage work within the territory. The Manual makes clear that Pilot does not operate its own cartage company, and that the cartage company for a station may be the franchisee, a cartage company owned by the franchisee, an owner-operator, or an independent contractor retained by the franchisee or Pilot (if a company station).

46.     The Manual explains Pilot must approve the cartage agent, which must meet various standards set forth in a document titled Pilot Cartage Standards. These standards include having various standards for drivers, keeping vehicles in good operating conditions, meeting various performance standards, following transportation paperwork requirements, and so on.

47.     Section 8.1(b) of the Manual states in all bold that "**[Pilot] views the cartage operations of our stations as one of the most integral aspects of our core competency**." The Manual later reiterates this point, by saying that the selection and operation of a proper cartage company "to represent Pilot Freight Services is one of the most fundamental and important aspects of our business model." Manual at § 8.2. The Manual and Cartage Standards recognize that franchisees may conduct their own cartage operations, and encourage franchisees to conduct their own cartage operations to ensure operational efficiency and control of the conduct of business in the franchisee's area.

48.     It is understood by Pilot and the Franchisees that the cartage agent will earn some kind of profit for its work. After all, company owned pilot stations must have a cartage agent and cartage agents would not work with Pilot stations if they were required to perform the cartage work

at a loss. Thus, cartage agents owned by a franchisee or franchisees operating the cartage work directly and approved by Pilot should reasonably expect to earn a reoccurring and significant stream of profitable revenue from the franchisee's and Pilot's performance of the Franchise Agreements.

**D.  Transferability of the Franchise Agreements**

49.     The Franchise Agreements recognize that the Franchised Business operated by Franchisees are valuable assets in which Franchisees have made a significant investment of time and resources, and that Franchisees have a right to transfer the Franchised Business and the Franchise Agreements to a qualified third-party. While the Franchise Agreements give Pilot the right to approve certain transfers in its sole discretion, Pilot's consent is not required if the proposed transfer meets a list of eleven enumerated requirements. Of those, the only provision providing Pilot any discretion is that the proposed transferee must demonstrate "that it meets [Pilot]'s educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Business (as may be evidenced by prior related business experience or otherwise), and has adequate financial resources and capital to operate the Franchised Business." Franchise Agreements at § 14.3.5. Within the United States alone, there is a robust pool of individuals and businesses that meet these requirements.

50.     As part of the transfer, the proposed transferee is required to sign a franchise agreement that is either the same as the Franchise Agreements or not materially different. Further, the transferee must sign a new agreement for a ten-year term. Said differently, at or near the end of ACL or CCG's ten-year term, each can sell the stations to any qualified buyer, who will then have another ten-year term. The ability to sell the stations for a ten-year term is incredibly valuable,

as it allows Franchisees to seek a multiple over yearly earnings that otherwise would not be available if Franchisees could only sell whatever remaining term exists on their franchise agreement. As of the start of 2022, the fair market value of Franchisees' three stations with a ten-year term on the franchise agreement exceeded $80 million.

### E.  Pilot Sold Out to Maersk

51.     In 2016, Pilot was sold by its long-standing owners to two private equity companies, ATL Partners ("ATL") and British Columbia Investment Management Corporation ("BCI"). ATL and BCI are referred to herein as "Prior PE Ownership." Pilot had always been predominantly franchised, but there were some company owned stations. After the purchase, Prior PE Ownership began to buy back stations from willing franchisees. The process resulted in the majority of the stations in the Pilot network being under the direct ownership and control of Pilot. However, Prior PE Ownership and Pilot honored all of its obligations under the Franchise Agreements to those franchisees who chose not to sell and Franchisees signed renewals of the Franchise Agreements in 2021.

52.     Under Prior PE Ownership, Pilot actively promoted and improved the Pilot brand, provided opportunities to all remaining franchisees, and otherwise treated each station fairly, and charged rates and royalties that were disclosed and consistent with the terms of the parties' agreements and published rate information.[2]

53.     In early 2022, Prior PE Ownership reached a definitive agreement to sell Pilot to the global shipping conglomerate A.P. Møller Maersk A/S for $1.7 billion. The transaction closed

---

[2] Although Prior PE Ownership actively promoted the Pilot brand and System, it was also engaged in an aggressive effort to "roll-up," (i.e. buy-back) the franchise owned stations and turn them into company owned stations. The purpose of the roll-up was to make a sale more attractive to a purchaser like Maersk. Plaintiffs and their counsel continue to investigate whether Prior PE Ownership and Defendants may have engaged in an unlawful, concerted effort during the sales process or thereafter to shift economic benefits away from Franchisees and to Maersk without regard to Plaintiffs' rights. If Plaintiffs discover any such activity, they reserve the right to amend the Complaint to join additional parties.

on May 2, 2022.  As a result of the transaction, Pilot's sole owner became Maersk Logistics & Services USA, Inc.

54.    In its press release announcing the acquisition, Maersk represented that Pilot would be rebranded as "Pilot-A Maersk Company," suggesting to the public and Franchisees that Pilot's existing branding would be kept largely intact and that Pilot would continue to have a separate identity for the consuming public, much like hotel chains keep their separate identities and branding even when bought by a larger hotel chain. https://www.maersk.com/news/articles/2022/05/02/maersk-completes-acquisition-of-pilot-freight-services#.

55.    At the time of the sale, Franchisees wished to confirm that Pilot would continue to honor its obligations post-closing and asked Pilot about its intentions. Pilot's then General Counsel responded with a two-line letter on May 4, 2022 stating that it "will continue to honor its obligations as Franchisor pursuant to the Franchise Agreement(s) with Matt Loux and his companies."

56.    For much of 2022, Maresk and Pilot's behavior suggested Pilot would retain its separate brand identity and that franchisees otherwise would be supported. In fact, Pilot's then president Zach Pollack told the entire Pilot System in a June 6, 2022 systemwide email (i) that the "main objective is to grow our organization—not shrink it," (ii) represented that the "opportunities ahead" with Maersk are "endless," and (iii) that working with Maersk would allow Pilot to expand. He also represented that they had conducted a test of Pilot handling the linehaul of consolidated parcels from a Maersk e-commerce fulfillment center to a United States Postal Service sort facility, and that growing this piece of work promised to "drive real growth through the network."

57.    It has since become apparent that these representations and those similar to it were entirely false and that Defendants had no and, through the date of this Complaint, continue to have no intention of complying with the Franchise Agreements or growing the Pilot brand or System.

**F.  Maersk and Pilot Purposely Destroy the Pilot Brand to Replace it with Maersk**

58.    Post-acquisition, Maersk reshuffled leadership at Pilot and it has recently become apparent to Franchisees that Pilot no longer has any ability to independently function or make decisions. Pilot instead must run all decisions of any consequence through Maersk. Further, Maersk has made certain determinations about how it wants Pilot operated, including for whose exclusive benefit Pilot will be operated, and Pilot is required to execute those decisions.

59.    Despite Maersk and Pilot making numerous representations to the contrary throughout 2022, it became clear around the first of the year in 2023 that Maersk had ordered and Pilot had agreed that, for all practical purposes, the Pilot system would operate under the brand name Maersk and lose its separate identity to the public.  During 2023, Maersk and Pilot took a number of actions to dilute, diminish, and ultimately abandon the Pilot brand and in effect dismantle the Pilot System.

60.    Notwithstanding Pilot's contractual duties to its then remaining franchisees as set forth above, Maersk started 2023 by announcing its intent to do away with the Pilot brand over the next 12 months. It sent a company announcement that it was abandoning the "Pilot-A Maersk Company" name and Pilot would be now known as "Maersk." Maersk circulated the following timeline spelling out exactly how it would dilute, diminish, and ultimately dismantle or abandon the Pilot brand:



61.     Consistent with this plan, Pilot began rebranding all of the Pilot-company owned

stations as Maersk stations. A large majority of the Pilot stations are now branded with Maersk

logos, trademarks, and trade dress. These stations no longer use any Pilot labels for shipment and

there is no Pilot branded marketing or sales materials available at these stations. All labels and

sales materials have been replaced with Maersk marketing materials and labels. Pilot similarly

transitioned the email address of all employees at all company stations and headquarters to

@maersk.com. Pilot and Maersk also have a group or team dedicated to changing the branding of

the remaining Pilot stations using Pilot branding to that of Maersk branding. For example, in May

2024, the group went to the Kansas City station and removed all of the Pilot branding and signage

and replaced it with Maersk branding and signage.

62.     Pilot, at Maersk's direction, then rebranded the Pilot website. In late June 2023,

Pilot's    long-time    website    www.pilotdelivers.com    had    its    name    changed    to

https://delivers.maersk.com. The website was also redesigned so that it mirrored, in structure,

appearance, and form, Maersk's primary website. Indeed, when a user types

www.pilotdelivers.com into their web browser, the user is automatically redirected to

https://delivers.maersk.com. The website has a banner that says "www.pilotdelivers.com is now

part of Maersk.com --Welcome to the newly branded site!"



63.     The Domestic Locations[3] page of the website, which has a prominent Maersk logo at the top of the page and employs Maersk's blue based color scheme, identifies the location of each company station that is owned by Pilot as follows:



## All Domestic Locations



**Albuquerque, NM**

5821 Midway Park Blvd NE Suite D
Albuquerque, NM 87109
Main Phone: **505-843-9779**
Fax: **505-843-9786**



**Allentown, PA**

964 Marcon Blvd. Suite 160
Allentown, PA 18109
Main Phone: **610-264-8777**
Fax: **610-264-8550**



**Anchorage, AK**

11100 Calaska Cir
Anchorage, AK 99515
Main Phone: **907-215-7120**
Fax: **907-248-0046**



**Atlanta, GA**

4380 International Parkway Suite B
Atlanta, GA 30354
Main Phone: **404-363-6633**
Fax: **404-363-0568**

---

[3]  https://delivers.maersk.com/global-network/domestic/

64. Franchisees' stations also appear on the Maersk branded webpage, though they use a different picture containing a Pilot logo, thus creating the impression that the Pilot and Maersk logos are interchangeable:







65.     The delivers.maersk.com website contains an "about us" subpage listing Pilot's history and then saying it was acquired by Maersk, further confirming that the Pilot System and brand has been abandoned and replaced with the Maersk mark and brand.

66.     On or around June 13, 2023, Pilot and Maersk announced that it was transitioning the Pilot System to the Maersk branding by sending a letter to all customers stating "Pilot to be rebranded as Maersk." A copy of the letter is attached hereto as Exhibit 3. The letter made clear that "Pilot's visual identity will be changed to the Maersk visual identity." The letter emphasized that it was a change in branding only, as "**the legal entity of Pilot will remain**," that "**Pilot legal entity continues unchanged**," and that it will "**not affect customer contracts, licensing, terms, conditions, or pricing**." (emphasis added). The foregoing semantics employed by Maersk is an effort to mask its systematic scheme to transfer all of the value and benefits of Pilot to Maersk without regard to Pilot's contractual obligations.

67.     Although Pilot, the unchanged legal entity, had clearly substituted the Maersk trademarks and branding for the Pilot branding and thus had designated the Maersk marks as Proprietary Marks, Pilot refused to make those marks available to Franchisees or to treat

24

Franchisees as full participants, let alone as equal stations, in the newly rebranded for some, but not for all, Pilot System. Instead, Pilot told customers that a "small number of franchisees operating in limited markets" will still utilize the Pilot brand and will "conduct operations" under a new website www.pilotdelivers.net. Pilot and Maersk falsely represented to the remaining franchisees and the public that the franchisees operating under this zombie brand would have "no effect on their operations or services."

68.     The website pilotdelivers.net is, in essence, a reskinned version of the delivers.maersk.com website. And even on the website, the Maersk mark is infused into the brand, as it makes clear under the Pilot logo that it is owned by Maersk, further demonstrating that the Maersk name and marks are now Proprietary Marks under the Franchise Agreements. Further, the exact same station locations that delivers.maersk.com says are Maersk stations are identified on the Pilot website as being Pilot stations with Pilot branding:



Notably, the address, phone number, and fax number are identical for each location on each website.

69.     The franchisee-specific Pilot website cannot be meaningfully located by any of the consuming public. A search for "Pilot Air Freight" on google.com takes users to https://delivers.maersk.com.



As of May 15, 2024, the date that the Google search was conducted that yielded the above screenshot, pilotdelivers.net does not even appear on the first fifty plus hits. Similarly, pilotdelivers.net did not appear for other common searches like "Pilot Air Freight Franchise" or even for "pilot delivers website." In 2024, a business of any scale in Franchisees' field must have some kind of easily locatable web presence on the internet to have any chance of success.

70.     Each Pilot station has a local phone number that is backed up by Pilot's national phone number, 1-800-HI-PILOT. Each station's phones are set to forward to the national number each night to ensure 24/7 service. The national number is now answered by "Maersk" employees, customer service staff tell customers that they have reached "Maersk," and the hold music is the same hold music as Maersk plays when calls are made to its lines.

71.     Franchisees tried to order new Pilot labels, stationery, and marketing materials for their stations. Notwithstanding that they have been told that they are not licensed or authorized to use the Maersk marks and that the Maersk marks have not been designated as Proprietary Marks under the Franchise Agreements, Franchisees were told that only Maersk branded materials could

be ordered and no sales literature for Pilot exists. This instruction was directly contradictory to other representations made by Pilot that Franchisees cannot use the Maersk brand.

72.     There are barcode labels that must be placed on a shipment before it is moved and each shipment must be accompanied by a bill of lading. Those barcodes and bills of lading historically have had Pilot's branding on it. Pilot, at Maersk's direction, has discontinued the Pilot branded labels and now all labels have "Maersk" branding. Franchisees contacted Pilot management and asked for the ability to order Pilot labels since they have been told not to use the Maersk marks. Pilot management purportedly instructed Pilot employees that Franchisees could order such labels, but Pilot has ceased responding to requests to order Pilot labels and Pilot labels remain unattainable. At their franchisor's insistence and in contradiction to Pilot's other instructions, Franchisees are now using Maersk barcode labels and Maersk bills of lading. Similarly, all invoices that customers now receive say "Maersk," not Pilot.

73.     Pilot, at the direction of Maersk, has taken the position that Franchisees and the other remaining franchisees in Tampa Bay and Miami are, in essence, operating within an entirely separate system and cannot use Maersk marks. Yet, the way that Pilot allocates payments to Franchisees on any shipment that requires a payment of Royalties in the form of a Gross Profits or where profits are split with other stations shows that Franchisees are very much still part of the rebranded Pilot system at least for the purpose of allocating funds to the Maersk controlled stations. As explained above, under the Franchise Agreements and long-standing Manual sections on royalties and profit splits, the collective profit of a particular account or transaction is pooled and then split between participating stations and the franchisee. Pilot continues to allocate profits this way and treats the now Maersk branded stations it owns as the "company stations" with which

27

Franchisees must split profits on shipments. Further, Pilot has told customers that nothing has changed regarding the legal relationship with Pilot, just the branding.

74.     On March 3, 2023, Pilot's then General Counsel Chris Ashiotes stated in in a letter that Franchisees' assertion that they had a right "to use the "Maersk" name or trademark . . . is baseless."  In the very same letter, Mr. Ashiotes made the false representation that "naturally Pilot will continue to be bound by the franchise agreement(s) and will continue to honor its existing obligations."

### G. Maersk and Pilot Have Been Directing Sales Opportunities Away from the Pilot System and Franchisees, in in Violation of the Franchise Agreements

75.     Maersk and Pilot have prevented Franchisees and Pilot from obtaining any new customers under Pilot branding. For example, new customers cannot be signed up under the online pilotdelivers.net website as Pilot customers. They must be signed up on the Maersk website and must tender shipments to Maersk. While franchisees can attempt to sell new accounts, they can only be directed to be sold under a Maersk brand. There is no longer any Pilot National Customer Service, Pilot National Account Program, or Government Programs.  In effect, Pilot is prohibiting Franchisees from using and fully exploiting the Pilot marks, which are their designated Proprietary Marks, in whole or in part, all in contravention of the terms and conditions of the Franchise Agreements.

76.     Further, Franchisees are aware of numerous instances following Maersk's acquisition in which business opportunities have been directed to other Maersk companies instead of CCG's franchise station in Norfolk, even though such work was within the type of work that is commonly conducted at the Norfolk station. Specifically, there was a long standing Pilot National Account for World Market. CCG has handled both domestic transportation as well as local warehouse services in the Norfolk area for World Market. In 2023, as part of the World Market

"Ocean Freight" negotiations, which is a service that Franchisees also provide, World Market inquired to Pilot and/or Maersk about warehouse and cross docking business in Norfolk. Maersk directed this business to a company it controls called Performance Team and not CCG, even though CCG does this specific work within the exclusive territory and even though CCG has a long-standing relationship with World Market.

77.     Upon information and belief, Pilot, at Maersk's direction, has been diverting opportunities that would normally belong to the Pilot System and would use Franchisees' stations to competing Maersk companies. Indeed, CCG was copied on an email between Maersk employees in February 2023 outlining over 50 pickups in CCG's exclusive Norfolk territory that were starting in February 2023. Franchisee never received any additional information on the shipments, were not given the shipments, and did not receive any profit splits on them. The only conclusion that can be drawn is that Maersk took traditional Pilot business, moved it through CCG's exclusive territory, and did not allow CCG to handle the shipments. Maersk's motive for circumventing Franchisees is obvious—it does not wish to share the revenues of this work, which rightfully belongs to Franchisee and the Pilot System, with Franchisees.

78.     Franchisees notified Pilot through counsel on February 28, 2023 of certain conduct that violated the exclusivity provisions in the Franchise Agreements. Pilot's then General Counsel Chris Ashiotes responded on March 3, 2023 that "We must point out that we are somewhat baffled by your letter, specifically the nonsensical suggestion that Section 1.3 somehow entitles [Franchisees] to handle the business of completely separate legal entities and operations or otherwise create any right for your client to use the 'Maersk' name or trademark. Such an assertion is baseless."

79.     Franchisees are obligated under the Franchise Agreements to grow the business, having annual revenue targets and various obligations to promote the Pilot brand. In furtherance of those obligations, Franchisees reached out to multiple individuals who they were told were Maersk's decision makers in the local markets to coordinate efforts to grow Pilot's brand. None of those individuals would interact with or help Franchisees. Indeed, CCG reached out from its Norfolk station multiple times to the Maersk employee that operates the Maersk steam line facility nearby to see if any assistance was needed. The Maersk employee responded that their instructions from Maersk was not to interact with or work with Franchisees.

80.     In late 2023, one of Pilot's National Accounts, World Market, went out to bid, which periodically happens with all customers. World Market is one of the Norfolk station's biggest customers. CCG has a strong working relationship with World Market and in the past obtained their "returns business" due to outstanding customer service. Before Maersk began interfering with Pilot, CCG would work with Pilot's National Account team to put together a response to World Market's request for proposal with the joint goal of retaining the business for the Pilot System.  CCG asked in October 2023 about the status of the bid, and was told by the previous President of Pilot (who now holds the title of Maersk Regional Head of Middle Mile), that "Maersk" was bidding on the business.  Maersk was not awarded this business, and, upon information and belief, Pilot did not even place a bid. Thus, due to Maersk's direct interference, this work is being transitioned away to a competitor on June 1, 2024. Moreover, Maersk directing Pilot not to bid on work that it already has was completely unjustified and contrary to the interests of Pilot and Franchisees. The only reason that Maersk would take this approach is so that it can cut out Franchisees and keep all the profit for itself.

81.     Franchisees have also become aware that Maersk frequently runs shipments through an operating system that cannot be accessed by Franchisees so that it can route shipments through Franchisees' exclusive territories without notifying Franchisees of the shipment or providing Franchisees their rightful share of the profits. Again, this is being done solely so Maersk does not have to split the profits on those shipments with Franchisees, as they would have to do if the shipment moves through the Pilot network of stations.

**H.  Pilot Refuses to Promote the Pilot Brand or Account for the Advertising Money**

82.     As previously stated, Pilot collects a percentage of Gross Billings from almost every shipment that is then contributed to the Fund. This amounts to hundreds of thousands of dollars per year that would otherwise be paid to Franchisees.

83.     Since the announced Maersk brand transition in early 2023, the only activities Pilot has taken regarding the Pilot brand has been to rebrand the pilotdelivers.com website as a Maersk website and to create an unlocatable pilotdelivers.net website, which is a virtual facsimile of the Maersk website.

84.     Franchisees are not aware of any other promotional or advertising activities taken on behalf of the Pilot brand by Pilot.

85.     Franchisees have asked on more than one occasion for an accounting of how the Fund is being spent, which they are entitled to upon request under the Franchise Agreements. Franchisees have never received any accounting.

86.     Upon information and belief, Pilot is using the Fund to promote its use of the Maersk marks and trade dress and otherwise to promote the activities of its parent company Maersk.

**I. Pilot, at Maersk's Direction, Has Refused to Provide Franchisees with Updated Operating Documents or New Information**

87. For all Pilot company owned stations, Maersk has instituted a new internal system that houses all documents, communications, ordering processes, and the like.

88. Pilot, at Maersk's direction, refuses to grant access to this new system to Franchisees, depriving Franchisees of the ability to learn about new changes, updates or upgrades to the Pilot system.

89. Pilot has not updated the Manual since the purchase by Maersk.

**J. Maersk Uses the Pilot System to Line Maersk's Pockets at the Expense of Pilot and Its Franchisees**

90. As detailed above, the Profit Pool business is one where Pilot and the Franchisees have agreed to share the Gross Profit generated from a particular account or shipment among Pilot and the relevant stations, with each station receiving a share of Gross Profits remaining after Pilot charges a Royalty. The share of Gross Profit received or attributed to each station is based on the amount of revenue the station generated for the particular account or shipment. This business is of considerable importance to Franchisees, and they have historically negotiated these relationships heavily with Pilot to ensure that they receive a fair share of the profits.

91. In the Pilot System historically, Pilot has operated as a non-asset based service provider, i.e. Pilot arranges the movement of the freight, but third-parties are hired to do the actual moving of goods. The cost paid for the transportation is an important input in the determination of Gross Profit, as Gross Profit is calculated by taking Gross Billing less the actual cost of transportation. As such, Pilot and Franchisees always sought to find the most competitive price option for transportation and Pilot was not allowed to charge a margin on the arranged

transportation. Said differently, if a third-party charged $100 to move a particular piece of freight, only $100 was deducted from the Gross Billings to determine Gross Profit.

92.     Pilot later developed its own linehaul business, the purpose of which was to provide a reliable and controlled network of carriers between stations that Pilot could count on. This system was first called the "Net System," but later was merged with a company called American Linehaul Network that Pilot had purchased. American Linehaul did not own any of the equipment or employ the drivers; rather, American Linehaul was simply a captive network of contractors. Franchisees were not required to place freight on this linehaul network, but would often choose to do so because the rates charged were similar to those of other third-parties and the active control of it by Pilot ensured a better level of service.

93.     Pilot would always provide Franchisees with rate information for specific kinds of transportation so that Franchisees could accurately price new business or provide spot pricing to National Accounts when requested. It also allowed Franchisees to determine whether it could earn certain margins of return on a particular shipment or business. Pilot would provide Franchisees with a hard copy of these rates and those same rates would be populated electronically in the Navigator operating system that Franchisees are required to use.

94.     Franchisees became aware in 2024 that the hard copy rates provided to it did not match the electronic rates being supplied by the IT system Franchisees are required to use by Pilot. Notably, the rate in the IT system displayed when creating a quote later would change at the time the Franchisee would post or bill out the shipment. The rates in many cases increased dramatically and without any specific warning to Franchisees. These changes occurred after a price had been quoted to the customer and a delivery had occurred. As best as Franchisees can tell, Maersk and

Pilot purposely programmed the IT systems to change rates without informing Franchisees of it and to do so only after work had already been quoted to customers.

95.    Franchisees asked Pilot about these rate inconsistencies and received no explanation from multiple individuals, including Brian Flower, who was Pilot's Head of Operations before having his title renamed to Maersk's Head of SWAT, Middle Mile, Fulfilled by Maersk Customer Delivery-NAM.  Franchisees have since determined that the rate changes are being done so that Maersk could generate a specific rate of return in the linehaul or other businesses that were involved in the shipment, thereby reducing the available profits to split with the Franchisees.

96.    In 2023, Pilot approached the Pilot franchisees in Florida and asked that they assist with new types of accounts with Amazon and Home Depot, to be run solely through Maersk Linehaul (which was known as American Linehaul prior to the Maersk acquisition).

97.    The Amazon and Home Depot business began in 2023 and used a significant amount of cartage capacity of Franchisees in some instances. The accounts showed significant losses for Pilot, with the business costing Pilot millions of dollars in losses per month and Franchisees hundreds of thousands of dollars in losses a month. Upon information and belief, the business, however, did not lose money for Maersk. Rather, Franchisees were told multiple times that Maersk was making "millions" and "fat profit" on this work, including by running the business through Maersk Linehaul and charging a significant margin over the actual cost of transport. Said differently, Maersk and Pilot had transferred any profit that would be generated out of the business from the Pilot stations and network into the Maersk Linehaul business.

98.    Because the Amazon and Home Depot business were being run through Pilot at a loss, Pilot and Maersk knew Franchisees would object to having to take work at a loss. The

franchisees spoke with Maersk and Pilot, and were told by Gordon Branov and Mike Andersen (executives from Maersk and Pilot) that Maersk and Pilot would pay Franchisees and/or their cartage businesses an amount that was supposed to allow Franchisees to earn a return on the work that was similar to the return that is normally earned on work. Franchisees were willing to agree to this arrangement.

99.     If Pilot were being run solely for the benefit of Pilot and its franchisees, then the Home Depot and Amazon work would have never been accepted at the prices charged because Pilot and its franchisees would lose money servicing those accounts.

100.     It has become clear that whether Franchisees can continue to receive these payments is at the discretionary whim of Maersk and Pilot, and in fact is being weaponized by Pilot and Maersk against other Pilot franchisees. Pilot recently conducted an audit of the Tampa Bay franchise, which is the smallest of the five remaining franchise locations. Much of the audit focused on the handling fee and commissions that the franchisee charged, with the auditors often questioning that franchisee's charging of handling fees or seeking an ad hoc payment. Pilot also withheld settlement payments from the Tampa Bay franchisee for almost three months before recently paying some amount of settlement payments to it. Upon information and belief, Maersk and Pilot conducted the audit, withheld payments for months, and made threats to take legal action if the handling fees are not paid back in an effort to try and weaken the Tampa Bay franchisee's financial standing and position, so that the Tampa Bay franchisee will sell at a discounted price or agree to go out of business. It was also done to try to create a record to terminate the Tampa Bay franchisee on a pretextual basis.  Finally, it has done this to send a message to Plaintiffs and to force them to accept any work sent by Pilot, even if such work would result in large losses. While

Maersk and Pilot have not taken any action against ACL's Jacksonville station yet, representatives of Pilot have said that Jacksonville is next up.

101.    Upon information and belief, Pilot and Maersk are actively trying to negotiate the Miami franchisee's exit from the Pilot System. Pilot and Maersk's intent is to isolate Franchisees and then try to terminate Franchisees or force them to sell at a highly discounted price.

102.    In addition, Maersk and Pilot have injected another one of Maersk's affiliates—Visible Supply Chain Management ("VSCM")—unnecessarily into the chain of work for many customers. This entity dispatches the work from the client to Pilot and then charges Pilot a management fee. Adding VSCM to the flow of work inflates the cost of transportation artificially so that Maersk receives more profit and the Pilot System receives less.

103.    Tom Drake was for many years the Director of Operations for Pilot and considered by most to be the "brains behind the operations." He was the person at Pilot who ensured accurate carrier pricing, that carriers provided quality service, that stations provided quality service, priced Pooled Accounts, and helped priced local accounts when requested by a station. After the Maersk acquisition, he holds the title Maersk Head of Pricing and Profitability Team.

104.    Mr. Drake recently confirmed to Franchisees that Maersk has made the decision for all Pilot business to use variable and dynamic freight rates that is charged against a particular order so that the Maersk linehaul business always makes a "Fat Profit."

105.    Plaintiffs have also become aware that Pilot, on certain shipments, has been manipulating the cartage rates paid for moving the shipment. Specifically, Pilot has coded certain accounts as local accounts, but set the cartage rate at the national account rate, which is a far lower rate than the local accounts work.

106.    The Franchise Agreements and Manual do not allow Pilot to set variable and hidden rates. The Franchise Agreement, Manual, and Cartage Standard do not allow Pilot to pay national cartage rates on local accounts when not agreed to in advance by the parties. The Franchise Agreements and Manual do not allow Pilot to change rates after the fact so as to manipulate the amount of profit directed to Pilot or Maersk. The Franchise Agreements do not require Franchisees to take money losing work. The Franchise Agreements contemplate that Pilot will honor all agreements it makes about the amounts paid to Franchisees. The Franchise Agreement and Manual do not allow Maersk to unnecessarily inject a subsidiary into the stream of freight handling and coordinating so it can charge a management or handling fee.

107.    Upon information and belief, Maersk has taken so much profit away from Pilot in how it has managed the flow of goods through the Pilot System and the billing and pricing to Pilot that Pilot has gone from being highly profitable to being unprofitable.

108.    Further, Mr. Drake confirmed to Franchisees that Pilot and Maersk have no intent of providing any meaningful assistance to Franchisees. Mr. Drake stated that he has been instructed by Maersk and Pilot leadership that "I cannot help franchisees" with any pricing issues. Mr. Drake's comments echo other statements made to Franchisees by Maersk personnel, including statements that "what Maersk is doing to you is awful," and statements that Maersk (and thus Pilot) has no intent of supporting Franchisees.

109.    Upon information and belief, Franchisees have made less profit than they otherwise should have under the terms of the Franchise Agreement and Manual due to Maersk and Pilot's machinations and manipulations of freight rates, artificial inflation of Maersk Linehaul profits, and the unnecessary injection of VSCM into the management of shipments. Pilot and Maersk's actions have decreased the amount of profit available to be split with Franchisees and have transferred that

profit to Maersk. Upon information and belief, Franchisees have lost out on more lucrative opportunities because they have been forced to assist with large volumes of money losing shipments. Maersk and Pilot's actions have deprived 1st Coast and Plaintiffs of revenue for cartage work. Maersk is not allowed to operate Pilot as a way to inflate revenue and profits for Maersk Linehaul, VCSM, and other Maersk businesses.

**COUNT I**
**Breach of Contract-Declaratory Judgment**
**(Franchisees v. Pilot)**

110.    Franchisees reallege and incorporate the allegations set forth in paragraphs 1 to 109 as though fully set forth herein.

111.    The Franchise Agreements are binding contracts.

112.    The Franchise Agreements remain in full force and Franchisees have not breached them.

113.    The Franchise Agreements grant Franchisees various rights to use the "Proprietary Marks," which are defined as "certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited to, the marks 'Pilot,' 'Pilot Air Freight,' 'Pilot Marine Services,' 'Pilot Logistics Services,' 'Pilot Freight Services,' as are now designated and may hereafter be designated from time to time by Franchisor in writing for use in connection with the System." Franchise Agreements at page 1.

114.    The Franchise Agreements reserve the right to Pilot to "modify the Proprietary Marks or substitute different marks for use in identifying the System and the businesses operating thereunder at Franchisor's sole discretion," and Franchisees must use the substituted marks. *Id.* at § 8.3.7.

115.     The Franchise Agreements make clear that the Proprietary Marks "serve to identify the System and those who are authorized to operate under the System." *Id.* at § 8.3.2.

116.     The Franchise Agreements establish various exclusivity rights that are tied to Pilot's use of the Proprietary Marks. *Id.* at § 1.3.

117.     A dispute has arisen about whether Pilot has changed the Proprietary Marks associated with the System to now include the name "Maersk" and the well-known Maersk marks, which, include, but are not limited to:[4]



118.     A dispute has arisen about how Section 1.3's exclusivity provisions should be applied in light of the substitution of the Maersk marks for the Pilot marks, including to what extent any competing businesses can be operated in the exclusive territories of the Franchisees under the tradename Maersk or in association with the name Maersk.

119.     Pursuant to 28 U.S.C. § 2201, an actual and justiciable controversy has arisen between the parties regarding the matters set forth in Paragraphs 116 and 117.

120.     Pursuant to 28 U.S.C. § 2201, Franchisees hereby are entitled to a declaration by this Court that the Proprietary Marks under the Franchise Agreements now include the Maersk marks and name and that Franchisees have the right to use such marks as they could any Proprietary Marks under the System.

---

[4] The marks used by Pilot that relate to Maersk are at least the following marks registered with the U.S. Patent and Trade Office: Serial No. 77121108, 7932248, 76254474,79321257,73044822.

121.     Pursuant to 28 U.S.C. § 2201, Franchisees hereby are entitled to a declaration by this Court that Pilot must honor the exclusive territory provisions of Section 1.3, including, but not limited to preventing any business using the Maersk marks to operate in Franchisees' territories if such business offers products or services that are the same as those offered in the System and, for products or services outside the System, without offering ACL a right of first refusal.

**COUNT II**
**Breach of Contract**
**(Franchisees v. Pilot)**

122.     Franchisees reallege and incorporate the allegations set forth in paragraphs 1 to 121 as though fully set forth herein.

123.     The Franchise Agreements are binding contracts. The Franchise Agreements further make the terms of the Manual binding on Pilot and Franchisees.

124.     Franchisees have performed all of their obligations under the Franchise Agreements and the Manual.

125.     Pilot's actions alleged in preceding paragraphs have breached numerous provisions of the Franchise Agreements, including:

      a.   The Recitals and Section 1.1, 7.1, 8.3.2, under which the parties agreed that Franchisees would receive a functioning System; that steps would be taken to protect the goodwill and reputation of the System; that the System has distinguishing characteristics; and that the System is operated pursuant to the Pilot marks. However, Pilot has gutted the System and abandoned use of the Pilot Marks. It has further allowed for business opportunities to be directed away from the Pilot System and instead to Maersk brands.

40

b.  Section 1.3(b) and 1.3(c), under which Franchisees have certain exclusive rights in their territories. Pilot, however, has violated those rights by directing opportunities to Maersk branded companies and otherwise cooperating with Maersk to allow such competing companies to operate in the territory.

c.   Section 3.2 and 6.3, under which Pilot promised to provide updated training and updated training courses. Pilot no longer provides any training to Franchisees.

d.  Section 3.5, in which Pilot agreed to make advertising and promotional materials available to Franchisees. Pilot, however, refuses to promote the Pilot brand or to allow Franchisees to operate as a Maersk branded station.

e.  Section 3.6, 3.7, and 9, which obligate Pilot to provide a Manual and other materials that provide Franchisees information on techniques for managing and operating the Franchised Business, including "required and suggested products, services, or suppliers and sales methods, new developments and improvements in Franchised Business operating techniques, and new developments in services and marketing techniques."

f.   Section 3.13, in which Pilot promised "to market and promote the System, in the Territory and otherwise." Pilot, however, has wholly ceased marketing and promoting the Pilot System. Further, it has allowed shipments to be directed away from the Pilot system and to other Maersk companies.

g.  Section 3.14, in which Pilot promised to provide Franchisees with reasonable backup information about customer transactions and invoices. However, Pilot has hidden rate information from Franchisees, has further engaged in changing

quoted rates after the fact and without notice to Franchisees, and has covertly manipulated the cartage rates.

h.  Section 4, including but not limited to Section 4.3, in which Pilot promised to calculate certain royalties based on Gross Profit, which is determined by calculating the difference between Gross Billings and the actual cost of transportation, and to otherwise follow the terms of the Manual when conducting transactions. Pilot, however, has in some instances been artificially manipulating and reducing the Gross Profit available by directing transportation services to Maersk companies, which are marking up the cost of transportation or inserting intermediary companies which inject unnecessary fees into the process, so as to transfer a portion of the profit from the Pilot profit pool and directly into Maersk's pocket.

i.  Section 9, including 9.4 and 9.5, which requires Pilot to provide a Manual, to keep the Manual current, and to not make changes to the Manual that would modify the material terms of the Franchise Agreements or the Manual. However, Pilot has made numerous changes to the functionality of the System and its operations that have not been documented in the Manual. Further, those changes materially conflict with the terms of the Franchise Agreements and the Manual. Pilot and Maersk also use an internal Maersk IT system that, upon information and belief, contains various correspondence, policy, and procedure documents that are pertinent to the operation of the Pilot System. Franchisees cannot access this IT system.

j.   Section 12, including but not limited to Sections 12.2.2, 12.2.3, 12.2.4, 12.2.6, and 12.4, which require Franchisees to make payments, totaling hundreds of thousands of dollars per year, to the Fund; for Pilot to use those monies solely for the promotion of the Pilot System; and for Pilot to account for those Funds. However, Pilot has ceased to conduct any promotion or advertising of the Pilot System. Pilot has failed to account for the spending of the Fund. While the Franchise Agreements provide Pilot with discretion in how advertising funds are spent, Section 12 does not allow Pilot to simply cease promoting the brand or System or providing an accounting of its spending.

k.   Section 14, which provides Franchisees with a right to transfer the Franchise Agreements to any individual or company that meets the requirements of Section 14.3, which includes that the transferee will receive a full ten-year term franchise agreement. Pilot's actions to dismantle the Pilot System and destroy the brand have made it impossible for Franchisees to transfer the Franchise Agreements at anything approaching their value if Pilot was otherwise abiding by the Franchise Agreements.

126.   In total, Pilot has fundamentally and materially breached the Franchise Agreements by abandoning use of the Pilot marks and name and otherwise wholly failing to perform its obligations under the Franchise Agreements to support the Pilot System.

127.   Pilot's breaches of the Franchise Agreements have caused Franchisees actual and compensatory damages, including, but not limited to lost profits, lost revenues, and a reduction in value that Franchisees can receive for the Franchise Agreements and associated business when transferred.

128.   Franchisees are also entitled to an accounting of Pilot's spending of the Fund.

129.   Franchisees are each entitled to recover their damages flowing from Pilot's breaches of the Franchise Agreements in an amount to be determined at trial that exceeds $75,000.

**COUNT III**
**Breach of Contract**
**(1st Coast v. Pilot)**

130.   1st Coast realleges and incorporates the allegations set forth in paragraphs 1 to 129 as though fully set forth herein.

131.   The Franchise Agreements, the Manual, and the Cartage Standards require each Pilot station to have a cartage agent for their exclusive territory. These documents recognize that the cartage agent is usually the franchisee or a company owned by the franchisee. Pilot describes the cartage agent as a fundamental component of the Pilot System.

132.   1st Coast is a cartage company that is owned by Matt Loux. It is the cartage company established by Mr. Loux to be a cartage agent that is necessary under the Franchise Agreements, Manual and the Cartage Standards. In a letter dated March 28, 2011, Pilot specifically recognized that Mr. Loux owned 1st Coast and it was his cartage company that would be providing services in the Jacksonville area.

133.   Since at least 2011, Pilot has further been aware of and recognized that 1st Coast has operated at the Norfolk station and that it is one of the captive cartage agents at that station.

134.   For as long as Franchisees have been involved in the Pilot System, it has been the intention and understanding of Pilot and its franchisees that franchisees can operate a cartage company and that the cartage company will earn revenue, at a profit, from the cartage of shipments arranged and sent through the Pilot System.

135.    Because the Franchise Agreements, Manual, and Cartage Standards require that the franchisee have a cartage company and because all parties understand and agreed that the cartage company will provide cartage services at agreed to rates, the parties intended for 1st Coast to be a beneficiary of Pilot's performance under the Franchise Agreements.

136.    Indeed, as a cartage agent, the vast majority of 1st Coast's revenue comes from the Pilot System and the cartage work generated by the transportation of cargo, freight, and shipments generated for Pilot and its customers.

137.    As an intended third-party beneficiary of the Franchise Agreements, 1st Coast has a right to ensure that Pilot complies with its rights and obligations under the Franchise Agreements. 1st Coast also has the right to sue for damages if Pilot fails to comply with its obligations under the Franchise Agreements.

138.    Here, Pilot has breached the Franchise Agreements for all of the reasons set forth in Counts I-II.

139.    Pilot's breaches of the Franchise Agreements have caused 1st Coast damages, including for lost revenues and profits related to the provision of cartage services within the exclusive territories of Franchisees.

140.    1st Coast is entitled to recover the damages flowing from Pilot's breaches of the Franchise Agreements in an amount to be determined at trial that exceeds $75,000.

### COUNT IV

**Tortious Interference with Contract and with Prospective Economic Relationships**
**(Franchisees v. Maersk)**

141.    Franchisees reallege and incorporate the allegations set forth in paragraphs 1 to 140 as though fully set forth herein.

142.   The Franchise Agreements are each a binding contract. The Franchise Agreements further make the terms of the Manual binding on Pilot and Franchisees.

143.   Maersk has intentionally interfered in the contractual relationship between Franchisees and Pilots in all of the ways set forth in the proceeding paragraphs. Maersk had a clear plan beginning in at least early 2023 to do away with the Pilot brand and Pilot System, and to use Pilot as a platform to profit other affiliates of Maersk. It executed this plan by exercising its plenary control over Pilot to force Pilot to engage in numerous activities that breach the Franchise Agreements so that Maersk can enrich itself.  At Maersk's direction, among other things, Pilot rebranded all of the System except for Franchisees' stations, stopped promoting the Pilot brand, stopped providing various types of support to Franchisees, directed business away from Franchisees' stations, issued competing bids for work that has traditionally been Franchisees', directed Pilot and Franchisees to use Maersk Linehaul and other Maersk affiliates for linehaul transportation at inflated rates so that Maersk Linehaul would earn a profit, unnecessarily added VSCM into shipment management, and manipulated freight rates after the fact to drive down profitability of Pilot and Franchisees. Maersk was aware that such conduct would be financially devastating to Franchisees over time and that such conduct interferes with Franchisees' contractual rights with Pilot, with customers, and with prospective customers of Pilot.

144.   Maersk lacked any justification or privilege to interfere in these contracts. While Maersk is the parent corporation of Pilot, that relationship does not give Maersk a justification or privilege to force Pilot to engage in the activities it has since at least January 1, 2023. Maersk has no justification to force Pilot to intentionally breach its contracts with Franchisees. Similarly, Maersk does not have a privilege to cause Pilot to become unprofitable and dissipate its resources. Maersk's conduct and control of Pilot has been done solely to aggrandize itself, both directly and

by interfering in a way to benefit Maersk Linehaul and other Maersk affiliates at the expense of Franchisees.

145.    There was no benefit to Pilot from Maersk's interference. The clear motive of Maersk's conduct was to make staying a franchisee so unpalatable that the remaining franchisees, including ACL and CCG, would leave the System at a discount or go out of business and Pilot (and thus Maersk) could capture their entire Pilot System business without having to share any of the proceeds with Franchisees. It would also allow Maersk to grow Pilot's corporate siblings at the expense of Pilot and Pilot's franchisees.

146.    As a result of Maersk's interference, Franchisees have suffered actual damages in an amount to be proved at trial. These damages include lost sales and sales opportunities for the Pilot System, lost profits, a decreased ability to transfer the franchises, or realize full value for them.

147.    Franchisees are each entitled to recover the damages flowing from Maersk's tortious inference with the Franchise Agreements and their customer and potential customer relationships in an amount to be determined at trial that exceeds $75,000.

**COUNT V**
**Tortious Interference with Contract**
**(1st Cargo v. Maersk)**

148.    1st Coast realleges and incorporates the allegations set forth in paragraphs 1 to 147 as though fully set forth herein.

149.    The Franchise Agreements are each a binding contract. The Franchise Agreements further make the terms of the Manual binding on Pilot and Franchisees.

150.    The Franchise Agreements, Manual, and Cartage Standards require each station to have a cartage agent for their exclusive territories. These documents recognize that the cartage

47

agent is usually the franchisee or a company owned by the franchisee. Pilot describes the cartage agent as a fundamental component of the Pilot System.

151.    1st Coast has been recognized by Pilot as the cartage agent for Franchisees. And, as set forth in Count III, 1st Coast is an intended third-party beneficiary of the Franchise Agreements, Manual, and Cartage Standards.

152.    As a cartage agent, a large percentage of 1st Coast's revenue comes from the Pilot System and the cartage work generated by the transportation of cargo, freight, and shipments generated for Pilot and its customers.

153.    As an intended third-party beneficiary of the Franchise Agreements, 1st Coast has a right to expect that Pilot will comply with its rights and obligations under the Franchise Agreements.

154.    Further, 1st Coast—pursuant to the Cartage Standards—enters into contracts with Pilot to provide cartage services within the exclusive territories of Franchisees.

155.    Maersk has intentionally interfered in the contractual relationship between Franchisees and Pilot in all of the ways set forth in Counts IV, for which 1st Coast is an intended third-party beneficiary. Maersk has also intentionally interfered in the contractual relationship between Pilot, Franchisees, and 1st Coast for the cartage services provided.

156.     Maersk lacked any justification or privilege to interfere in these contracts for the same reasons as set forth in Count IV.  In addition, Maersk's activities improperly would allow Maersk to capture the cartage business from 1st Coast.

157.    1st Coast has suffered actual damages as a result of Maersk's interference in the various contracts. These damages include lost opportunities to provide cartage services and the revenues and profits associated with such work.

158.    1st Coast is entitled to recover the damages flowing from Maersk's tortious inference with the Franchise Agreements, the Manual, and Cartage Standard, and 1st Coast's cartage relationship with Franchisees and others in an amount to be determined at trial that exceeds $75,000.

**COUNT VI**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(1st Cargo and ACL v. Defendants)**

159.    1st Coast and ACL reallege and incorporate the allegations set forth in paragraphs 1 to 158 as though fully set forth herein.

160.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful all unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

161.    FDUTPA allows any person who has suffered a loss as a result of a violation to bring a claim for actual damages. Fla. Stat. § 501.211.

162.    A deceptive trade practice is any action that has the tendency or capacity to deceive consumers.

163.    Florida courts have defined an unfair trade practice in multiple ways. Some courts have defined it as an act that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Others have defined it as an act that causes any injury that is substantial, must not be outweighed by any countervailing benefits to consumers or competition that the practice produces, and must be an injury that could not be reasonably avoided. Under either definition, Defendants' conduct violates FDUTPA.

164.    Defendants' conduct alleged in this Complaint, including their systematic and unlawful dismantling of the Pilot franchise System, their false representations to the public and

49

ACL that the Pilot System will remain intact, their manipulation of the pricing of freight rates and cartage rates, their misrepresentations and machinations about the charges related to the Amazon and Home Depot work, their directions to Pilot personnel and Maersk personnel to not support ACL, and their purposely directing opportunities to Maersk for the benefit of Maersk causes a substantial injury to ACL and 1st Coast. There is not procompetitive purpose to Maersk and Pilot's actions. ACL and 1st Cargo could not reasonably avoid the conduct and injury.

165.    Similarly, Defendants' actions violate public policy, and are otherwise immoral, unconscionable, unethical, oppressive, and unscrupulous.

166.    Defendants' actions were also deceptive in that Defendants made explicit misrepresentations about their intent to support the Pilot System—including that it would remain intact, that they are supporting it, and that they are honoring the Franchise Agreements—when in fact Defendants had instructed their employees to take no actions to assist ACL and they had no intent of performing numerous obligations under the ACL Franchise Agreement. Similarly, Defendants' manipulations of cartage and shipping rates are similarly deceptive.

167.    Defendants' action related to the conduct of trade and commerce in Florida.

168.    Defendants' actions have caused ACL and 1st Cargo to suffer actual damages, including, but not limited to a loss of profits, and diminution in the value of the businesses if sold.

169.    1st Coast and ACL are each entitled to recover the damages flowing from Maersk and Pilot's violation of FDUTPA in an amount to be determined at trial that exceeds $75,000.

**COUNT VII**
**Violation of the Virginia Retail Franchising Act ("VRFA")**
**(CCG v. Pilot)**

170.    CCG realleges and incorporates the allegations set forth in paragraphs 1 to 169 as though fully set forth herein.

171.    CCG has entered into two written agreements with Pilot. Each grants CCG the right to right to engage in the business of distributing goods and services at retail under a marketing plan or system prescribed in substantial part by Pilot. The operation of CCG's business is pursuant to the Proprietary Marks designated by Pilot. CCG paid a franchise fee of more than $500 to maintain its rights under the agreements. Thus, the agreements qualify as "franchises" under Va. Code § 13.1-559(A).

172.    CCG is a franchisee as that term is defined in Va. Code § 13.1-559(A). Pilot is a franchisor as that term is used under Va. Code § 13.1-559(A).

173.    CCG's franchise agreements require them to maintain a place of business in Virginia and to perform the franchise agreements in Virginia. Va. Code § 13.1-559(A). CCG has two places of business in Virginia and performs the franchise agreements in Virginia.

174.    Under the VRFA, it is unlawful "for a franchisor to cancel a franchise without reasonable cause or to use undue influence to induce a franchisee to surrender any right given to him by any provision contained in the franchise." Va. Code § 13.1-563. Pilot's conduct described above violates §13.1-563 as Pilot has improperly caused CCG to surrender numerous rights under the CCG Agreement, including under Section 1.1, 1.3(a), 1.3(b), 1.3(c), 8.2, 3.2, 3.5, 3.6, 3.7, 3.13, 3.14, 4.3 7.3, 8.2.3,8.37, 9,12, 12.2.2, 12.2.3, 12.2.4, 12.2.6, 12.4, 14.

175.    Pilot's breaches have caused CCG actual, compensatory, and consequential damages, including past and future lost profits, damages related to the destruction of the ability to sell the franchise, and overpayment of advertising fund fees. As such, CCG may bring a cause of action under Va. Code § 13.1-571 for damages suffered as a result of any violation of Va. Code § 13.1-564.

176.    CCG may also recover all attorney's fees related to the costs of this action pursuant to Va. Code § 13.1-571.

177.    To the extent that the Franchise Agreements contains any limitations of liabilities, internal statute of limitations, or other terms that seek to limit the application of the VRFA, such provisions violate Va. Code § 13.1-571(c) and are void.

178.    CCG is therefore entitled to recover damages in excess of $75,000 from Pilot in an amount to be determined at trial.

**COUNT VIII**
**Civil Conspiracy**
**(All Plaintiffs v. All Defendants)**

179.    Plaintiffs reallege and incorporate the allegations set forth in paragraphs 1 to 178 as though fully set forth herein.

180.    As shown by the conduct in the preceding paragraphs, Pilot and Maersk have combined together to have the common purpose to destroy the Pilot System, breach the Franchise Agreements, tortiously interfere with the Franchise Agreements, tortiously interfere with 1st Cargo and Franchisees' business expectancy, and violate Virginia and Florida statutory law. Such actions are unlawful, have been conducted by a variety of unlawful means, and otherwise had an unlawful purpose.

181.    Pilot and Maersk have engaged in multiple overt actions in furtherance of this common purpose that are detailed above. Those actions include, but are not limited to, Maersk instructing Pilot to engage in activities meant to dismantle the Pilot System and Brand; Maersk and Pilot refusing Franchisees the right to use the Maersk marks; Defendants working together to manipulate freight rates and cartage rates; Maersk instructing and Pilot agreeing not to help

Franchisees; and Maersk and Pilot directing opportunities away from Franchisees and 1st Coast.

182.    Defendants' actions have caused damages to Plaintiffs in the form of lost revenues, lost profits, lost business opportunities, and destruction of Franchisees' ability to transfer their Franchise Agreements to a qualified buyer. Defendants are thus jointly and severally liable for this underlying conduct.

183.    Plaintiffs are entitled to recover damages in excess of $75,000 from Defendants in an amount to be determined at trial.

* * *

**WHEREFORE**, Plaintiffs requests the following relief:

a.    A declaration that the Maersk marks, trade name, trade dress, and proprietary methods of operations qualify as Proprietary Marks and are now part of the Pilot System under the Franchise Agreements;

b.    A declaration that Pilot must honor the exclusive territory provisions of Section 1.3, including, but not limited to, preventing any business using the Maersk marks to operate in Franchisees' territories if such business falls within the scope of the product or services offered in connection with the Proprietary Marks or the System and, for services or products outside the System, without offering ACL a right of first refusal;

c.    Actual damages;

d.    Compensatory damages;

e.    Consequential damages;

f.    Attorneys' fees, costs, expert fees and investigative fees incurred in connection with this action as allowed by the Agreement, the VRFA, FDUTPA, and any other applicable statutory, contractual, or common law provision;

g.      Pre-judgment interest;

h.      Post-judgment interest; and

i.      Such other relief as this Court deems just and proper.

PLAINTIFFS AMERICAN CARGO
LOGISTICS, INC., CAVALIER CARGO
GROUP, INC., 1ST COAST CARGO,
INC.

/s/ *Christopher Bailes*

Christopher Bailes
WIGGIN AND DANA LLP
Two Liberty Place
50 S. 16th Street, 29th Floor
Philadelphia, PA 19102
Tel: (215) 988-8311
Fax: (203) 782-2889
cbailes@wiggin.com

John M. Doroghazi (*pro hac vice to be filed*)
WIGGIN AND DANA LLP
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
(203) 782-2889 fax
jdoroghazi@wiggin.com

Michael E. Demont (*pro hac vice to be filed*)
John W. Wallace, Jr. (*pro hac vice to be
filed*)
SMITH HULSEY & BUSEY
One Independent Drive, Suite 3300
Jacksonville, Florida 32202
904-359-7700
mdemont@smithhulsey.com
jwallace@smithhulsey.com

*Attorneys for Plaintiffs*

33628\1\4855-9170-4769.v5